516 A.2d 299

ROBINSON PROTECTIVE ALARM COMPANY

v.

BOLGER & PICKER, Appellee,

v.

Richard ROBINSON

and

Continental Bank, Appellants.

Appeal of CONTINENTAL BANK.

Supreme Court of Pennsylvania.

Argued Jan. 22, 1986.

Decided Oct. 3, 1986.

Marvin Comisky, Ronald H. Surkin, Victor A. Young, Philadelphia, for appellants.

Richard M. Jordan, Brent S. Gorey, Philadelphia, for Bolger & Picker.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

NIX, Chief Justice.

The pivotal question raised in this appeal is the applicability of section 2 of the Uniform Fiduciaries Act ("UFA"), Act of May 31, 1923, P.L. 468, 7 P.S. § 6361, in a suit for indemnity and/or contribution sounding in assumpsit

against a bank for the subsequent misapplication of funds surrendered to a fiduciary who was entitled to receive said funds. For the reasons that follow we conclude that section 2 was applicable and relieved appellant of liability for the subsequent misconduct of the fiduciary.

In January of 1973, the law firm of Bolger & Picker ("B & P") opened an escrow account in its name on behalf of a client, Robinson Protective Alarm Company, at the Continental Bank ("Continental").[1] Three partners of the law firm, including attorney Richard Robinson ("Robinson"),[2] executed the signature card for the account. Although any one of the three signatory partners was authorized to make deposits in and withdrawals from the escrow account, Robinson became the sole manager of the account. Continental was not a party to the escrow agreement B & P had entered into with its client, and was not aware of its terms.[3]

From the inception of the escrow arrangement through March, 1978, Robinson made deposits and maintained the bank account, which was kept in the form of a passbook savings account and in non-negotiable certificates of deposit, with no known irregularities. Beginning in April, 1978, however, Robinson engaged in a series of transactions which led to the embezzlement of Three Hundred Forty-six Thousand, Two Hundred Forty-seven Dollars and Seventy-five Cents ($346,247.75) of the escrow funds. The embezzlement was carried out in three separate operations. First, on April 5, 1978, Robinson redeemed a certificate of deposit and placed the proceeds in the escrow passbook account.

1. Robinson Protective Alarm Company, pursuant to a tax dispute with the City of Philadelphia, placed approximately $50,000.00 per year into the escrow account pending final judicial resolution of its liability.

2. Richard Robinson is not related to the owner or operators of appellee's client, Robinson Protective Alarm Company.

3. The Superior Court affirmed the lower court finding that Continental was not a party to the escrow agreement and thus its terms are immaterial to the appeal herein. We find this conclusion adequately supported by the record and therefore will not disturb this finding of fact. *Chatham Communications, Inc. v. General Press Corp.,* 463 Pa. 292, 344 A.2d 837 (1975); *In Re Lanning's Estate,* 414 Pa. 313, 200 A.2d 392 (1964).

The next day, he directed Continental to draw a check against that savings account for the sum of One Hundred Thousand Dollars ($100,000.00) payable to the order of "BEDCO," an acronym for the investment firm of Blythe, Eastman, Dillon and Company (Hereinafter referred to as "BEDCO"). A treasurer's check was prepared as directed, and delivered to Robinson. Second, on May 4, 1978, Robinson redeemed another certificate of deposit. He directed that the proceeds of the second certificate be delivered to him in the form of a check payable to BEDCO. Continental followed Robinson's instruction and delivered to him a check in the sum of One Hundred Forty Thousand Dollars ($140,000.00), payable as requested. Third, on January 2, 1979, a third certificate was redeemed; and a check for the proceeds in the amount of One Hundred Six Thousand, Two Hundred Forty-seven Dollars and Seventy-five Cents ($106,-247.75), payable to B & P as escrow agents, was delivered to Robinson pursuant to his instruction. In each of these three transactions the certificate was redeemed and the proceeds disbursed without the signature of any of the B & P partners, but rather solely upon the oral instructions of Robinson. The proceeds from those certificates of deposit, totalling Three Hundred Forty-six Thousand, Two Hundred Forty-seven Dollars and Seventy-five Cents ($346,247.75), were subsequently embezzled by Robinson and applied to his own use.

Initially, Robinson Protective Alarm Company sued B & P for the embezzled funds. After the loss was paid by B & P's insurer, the law firm commenced an action in assumpsit against Continental for indemnity and/or contribution. Continental joined Richard Robinson, who had also been sued by B & P, and cross-claimed against B & P for the costs of litigation.[4]

■ The Court of Common Pleas of Philadelphia County initially entered an opinion and verdict in favor of B & P

---

**4.** Richard Robinson is without assets. *Robinson Protective Alarm Company v. Bolger & Picker,* No. 196 Feb. Term, 1979 (C.C.P.Phila. April 6, 1983) slip op. at 1–2.

and against Continental for the loss of the escrow funds, because of the manner in which the bank redeemed all three certificates. In this regard, the trial court reasoned that Continental, by not obtaining endorsements prior to redeeming the certificates, had violated the redemption provisions set forth on the certificates,[5] and had thereby committed a breach of contract. This contract theory, as such, was the basis for the trial court's initial decision.[6]

After the filing of exceptions by Continental, the trial court modified its decision as to the scope of the bank's liability. The trial court concluded that, with regard to the first and third certificates of deposit, the procedure followed by Continental in redeeming them satisfied "reasonable commercial standards" within the meaning of 13 Pa. C.S. § 3419(c),[7] and therefore the bank had no liability for

5. The language on all three certificates of deposit reads in pertinent part as follows:
> This certificate will mature and be payable on _____ and may be redeemed upon presentation and surrender *duly endorsed* by the registered owner (emphasis added).

6. An alternative argument raised by Continental in this appeal is that the trial court erred in permitting, on the eve of trial, an amendment to the complaint raising for the first time the breach of contract theory upon which recovery was ultimately permitted by the court below. In view of our decision, we need not consider that contention. We note, however, that it has been firmly established that the right to amend a pleading is a matter of judicial discretion and should be liberally granted at any stage of a proceeding unless it constitutes surprise which results in prejudice to an adverse party, or the grant thereof constitutes an error of law. *Berman v. Herrick,* 424 Pa. 490, 227 A.2d 840 (1967); *Posternack v. American Casualty Co. of Reading,* 421 Pa. 21, 218 A.2d 350 (1966); *Schaffer v. Larzelere,* 410 Pa. 402, 189 A.2d 267 (1963); *Yentzer v. Taylor Wine Co.,* 409 Pa. 338, 186 A.2d 396 (1962); *Cucinotti v. Ortmann,* 399 Pa. 26, 159 A.2d 216 (1960).

7. Section 3419(c) provides:
> **(c) Limitation on liability of representative.**—Subject to the provisions of this title concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the *reasonable commercial standards* applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

We are not called upon in this appeal to consider the application of section 3419(c). We do note, however, that this section applies only

those transactions. However, according to the trial court's final decision, Continental did not pursue "reasonable commercial standards" when it redeemed the second certificate; and, as to that instrument, the determination of liability under the contract theory—in the amount of One Hundred Forty Thousand Dollars ($140,000.00)—was left standing.

The Superior Court affirmed the Court of Common Pleas, agreeing that Continental had committed a breach of contract as to the second certificate and was liable for the resultant loss. *Robinson Protective Alarm Co. v. Bolger & Picker*, 337 Pa.Super. 503, 487 A.2d 373 (1985).

In the proceedings before the trial court and in the Superior Court, Continental asserted, unsuccessfully, that section 2 of the UFA shielded it from liability for *any* of the losses caused by Robinson's defalcations. In the wake of the Superior Court's decision, Continental petitioned our Court for an allowance of appeal. We granted the bank's petition for review.[8]

■ Before reaching the question of the applicability of section 2 of the UFA it must be noted that there is serious question as to the legitimacy of B & P's purported assumpsit theory.[9] Nevertheless, we will assume the existence of

to negotiable instruments. The definitional section of the Uniform Commercial Code-Commercial Paper defines "instrument" as "A *negotiable* instrument." (Emphasis added.) See 13 Pa.C.S. § 3102. These certificates of deposit on their face state that they are in face non-negotiable instruments. This, however, is of no real consequence since our ultimate finding of the applicability of section 2 of the UFA would support a finding of no liability on the part of Continental in all three situations.

8. On February 21, 1985 appellee filed a cross-petition for allowance of appeal with respect to Continental's liability for the loss resulting from the embezzlement of the escrow account funds pursuant to the first and third transactions. By per curiam order dated June 14, 1985 we denied allocatur. Although section 2 of the UFA, if found to be applicable, would relieve Continental of liability to appellee in all three transactions, we have before us on this appeal only the question relating to the second transaction.

9. First, the predicate of the breach of contract theory is that the language on the certificate requiring the endorsement constituted a binding contract between the owners of the certificate and the depositary. However, appellant argues that the provision in question was

a binding contract and its breach to reach the question of the applicability of section 2 of the UFA. For the reasons that follow we believe that the Superior Court erred in holding that section 2 was no defense to liability for breach of the contract and that the importance of this ruling in this field of law requires that we reach the issue in this case.

In affirming the lower court's holding that section 2 was inapplicable in a cause of action in contract, the Superior Court made two interesting observations:

The Act shields banks from liability when they act honestly in fiduciary relationships, but not when they wink at obvious irregularities.... The Uniform Fiduciaries Act was not designed to supersede contract law.

*Robinson Protective Alarm Co., supra,* 337 Pa.Super. at 512, 513, 487 A.2d at 377, 378. As to the first statement it is agreed that the UFA does not permit a bank to ignore an irregularity where it is of a nature to place one on notice of improper conduct by the fiduciary. In such a case the good faith test would not be met. However, we do not find that the failure to secure Robinson's endorsement on the certifi-

for the convenience and protection of the bank relating to a non-negotiable instrument and thus could be waived unilaterally by the bank. It is urged that in the case of a non-negotiable instrument an endorsement serves only to identify the authorized signatory who in this case was known to the bank. *In re Blose's Estate,* 374 Pa. 100, 97 A.2d 358 (1953); *Layman v. Western Savings Bank,* 302 Pa.Super. 433, 448 A.2d 1119 (1982); 10 Am.Jur.2d *Banks* § 461 (1963).

Second, it is urged by appellant that even assuming that this was a binding contract term upon the depositary, the failure to secure the required endorsement did not occasion or facilitate the subsequent embezzlement. The appellant thus relies upon the well standing principle that a loss is not recoverable on the ground of contract breach where there is no causal relationship between the breach and the loss. *R.I. Lampus Co. v. Neville Cement Products Corp.,* 474 Pa. 199, 378 A.2d 288 (1977); *Exton Drive-In, Inc. v. Home Indemnity Co.,* 436 Pa. 480, 261 A.2d 319 (1969); *Adams v. Speckman,* 385 Pa. 308, 122 A.2d 685 (1956); *Taylor v. Kaufhold,* 368 Pa. 538, 84 A.2d 347 (1951); *Macchia v. Megow,* 355 Pa. 565, 50 A.2d 314 (1947); *Spiese v. Mutual Trust Co.,* 258 Pa. 414, 102 A. 119 (1917); *Clyde Coal Co. v. Pittsburg & L.E.R. Co.,* 226 Pa. 391, 75 A. 596 (1910); *Adams Express Co. v. Egbert,* 36 Pa. 360 (1860); *Hadley v. Baxendale,* 9 Ex. 341 (1854); 5 A. Corbin, Corbin On Contracts § 997 (1964); 11 S. Williston, A Treatise On The Law of Contracts § 1344 (3d ed. 1968).

cate, when he was known to the bank officials as the person authorized to receive the proceeds, was conduct that would raise such a suspicion. Moreover, we have found no persuasive authority nor have we been presented with any impressive argument to support the conclusion that this section of the UFA is not applicable to an alleged breach of contract.

■ Continental contends that section 2 of the UFA insulates it from liability for its handling of the second certificate of deposit. Section 2 of the UFA provides:

> A person who, in *good faith,* pays or transfers to a fiduciary any money or other property, which the fiduciary as such is authorized to receive, *is not responsible for the proper application thereof by the fiduciary,* and any right or title acquired from the fiduciary in consideration of such payment or transfer is not invalid in consequence of a misapplication by the fiduciary.

7 P.S. § 6361 (emphasis added).[10]

From the very language of this provision it is clear that, if a person acting in "good faith" pays money to a fiduciary authorized to receive it, the payor bears no liability for a subsequent misapplication of those funds by the fiduciary. The definition of "good faith" is set forth in section 1(2) of the UFA, 7 P.S. § 6351(2), which states:

> A thing is done 'in good faith,' within the meaning of this act, when it is in fact done honestly, *whether it be done negligently or not.* (Emphasis added).

■ Under this standard, negligence will not negate "good faith." *Davis v. Pennsylvania Co.,* 337 Pa. 456, 12 A.2d 66 (1940). Even a failure to inquire under suspicious circumstances will not negate "good faith," unless the failure to do so is due to a deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction. *Id.* Conversely, if a bank has knowledge that a fiduciary intends to appro-

---

**10.** The definitional section of the UFA defines the term "Person" as including "a corporation, partnership, or other association ...", 7 P.S. § 6351(1).

priate trust funds to his own use, and that to release funds to him will aid a breach of trust, then the bank will be held to have acted in "bad faith." *Witherow v. Weaver*, 337 Pa. 488, 12 A.2d 92 (1940); *Pennsylvania Co. v. Ninth Bank & Trust Co.*, 306 Pa. 148, 158 A. 251 (1932).

In the case at bar, there is no disputing that Richard Robinson was a fiduciary, within the meaning of the UFA, as to the escrow funds in question; and that he was empowered to receive them from Continental. This case does not present the slightest hint, or even an allegation, that any representative of the bank acted with a dishonesty of purpose in releasing the funds to Robinson without first securing his endorsement. Notwithstanding these considerations, the trial court and the Superior Court concluded that section 2 of the UFA did not operate to shield Continental from liability. Both courts held that, although the section 2 immunity extends to the *negligent* release of funds to a fiduciary, it does not encompass a disbursement made in a manner that constitutes a *breach of contract.*

There is no reason for imagining that section 2 of the UFA means anything short of what it so clearly states: that if a person acts in "good faith" in paying money over to a fiduciary authorized to receive it, the payor is not responsible for the subsequent proper application of those funds by the fiduciary. There is nothing on the face of section 2, or in any other provision of the UFA, that would restrict the immunity from liability to suits based on negligence—or preclude its applicability merely because a claim for recovery rests on a contract theory. Courts may not read into a statute restrictions the legislature did not see fit to include. *See Commonwealth v. Rieck Investment Corp.*, 419 Pa. 52, 213 A.2d 277 (1965); *Commonwealth v. Swing*, 409 Pa. 241, 186 A.2d 24 (1962); *Altieri v. Allentown Officers' and Employees' Retirement Board*, 368 Pa. 176, 81 A.2d 884 (1951). The legislature, in defining the term "in good faith", expressly provided *"whether it be done negligently or not."* The italicized words in this provision were not intended to limit the application of the

"good faith" standard to a particular cause of action, but rather to further clarify the meaning of the term "good faith" as used in the Act.

The intent of section 2 of the UFA in limiting a depositary's duty to that of "good faith," or honesty, is to facilitate banking transactions by relieving a depositary of the responsibility of seeing that an authorized fiduciary will use entrusted funds for proper purposes. *Davis v. Pennsylvania Co., supra; Gordon v. Hamilton Savings and Loan Ass'n,* 207 Pa.Super. 231, 217 A.2d 843 (1966). *Accord, Johnson v. Citizens National Bank of Decatur,* 30 Ill.App.3d 1066, 334 N.E.2d 295 (1975); *National Casualty Co. v. Caswell & Co.,* 317 Ill.App. 66, 45 N.E.2d 698 (1942). To apply a theory which would hold a payor liable for a minuscule and irrelevant departure from the prescribed procedure, where he has acted honestly in releasing money to a known authorized fiduciary, without knowledge of the latter's intent to subsequently embezzle those funds, would clearly not contribute to the smooth flow of commerce sought to be achieved by the UFA. Indeed, in the absence of contrary knowledge on the depositary's part, it is entitled, if not bound, to presume that a fiduciary will properly apply funds released to him. *Witherow, supra; National Casualty Co.*

We are not faced here with a case where the bank has expressly undertaken the responsibility of insuring the fidelity of the fiduciary in the discharge of the latter's responsibility. Moreover, such a contract would be highly unusual since in most instances the bank is not in the position to fulfill such an undertaking. Nor is there any justification for equating every breach of contract with an absence of good faith.

The bank met its responsibility by turning over the proceeds from the certificate to the party to whom it was obligated to surrender them. We are here satisfied that the bank indeed acted in good faith and that its failure to secure Robinson's endorsement did not demonstrate other-

wise. As observed in *Johnson v. Citizens National Bank of Decatur, supra,* the burden of employing an honest fiduciary falls on the principal. The miscarriage of the choice made should not, as a general rule, burden a bank or other third party who has dealt with the fiduciary in "good faith."[11]

Accordingly, the Order of the Superior Court is reversed to the extent that it affirmed the judgment of liability as to the second certificate of deposit.

HUTCHINSON, J., files a concurring opinion in which ZAPPALA, J., joins.

PAPADAKOS, J., files a concurring opinion in which HUTCHINSON, J., joins.

HUTCHINSON, Justice, concurring.

I concur in the result reached by the majority. They correctly state that recovery on a breach of contract theory requires a causal relationship between the breach and the loss and none is shown here. (Majority opinion at 303, n. 9).

The failure of the appellant-depository to secure the signature of the party expressly empowered to redeem the certificates of deposit did not contribute in any way to the loss suffered by the appellee. Thus, I am troubled by the eagerness of the majority to assume the requisite causal link in order to reach the question of whether the Uniform Fiduciary Act wholly insulates the depository from contractual liability unless it acts in bad faith. The majority's discussion regarding the Uniform Fiduciary Act is unnecessary and possibly mischievous dictum.

I do not believe the Uniform Fiduciary Act was intended to abrogate express contractual obligations by which a

11. In an alternative argument B & P seeks to uphold the result reached by the Superior Court by contending that the certificate was not "properly payable" within the meaning of section 4401(a) of the Uniform Commercial Code, 13 Pa. C.S. § 4401(a), without the endorsement and therefore the bank could not properly make a charge against the account. This argument is clearly without merit where the bank paid out to an authorized payee.

depository expressly imposed upon itself a standard of care higher than good faith. Although I find no evidence on this record of the kind of express bargain necessary to overrule the good faith standard the Act normally implies into such contracts, in my view, if a depositor-fiduciary bargains for a higher standard of care and the depository expressly agrees to be governed by that higher standard, that agreement should be enforced. Such an agreement should not be easily implied and the Act's standard of good faith should be the standard used in any doubtful case. Any implication of such an agreement, in the absence of an expressly undertaken obligation, would defeat the Act's general purpose of facilitating commercial transactions involving assets held by a fiduciary.

The Uniform Fiduciary Act wisely relieves depositories of the obligation to ascertain the legitimacy of a fiduciary's transaction so long as the depository acts in "good faith." This insures the expeditious flow of commercial transactions.

Nevertheless, a depository should not be allowed to utilize the Uniform Fiduciary Act as an impenetrable shield against liability to which it has expressly agreed in assuming a contractual duty to scrutinize payments or deliveries to a depository-fiduciary. In short, the Act's protections against liability should not be extended to undermine contractual liabilities which are bargained for and expressly assumed.

ZAPPALA, J., joins in this concurring opinion.

PAPADAKOS, Justice, concurring.

I concur in the result because the lack of a signature on the certificate of deposit, a non-negotiable instrument, was totally irrelevant to the loss sustained by Appellee. I believe that the majority has adequately disposed of the entire dispute in its explanation appearing in footnote 9, page 303, where the majority affirms the " ... well standing principle that a loss is not recoverable on the ground of contract breach where there is no causal relationship be-

tween the breach and the loss." (Citations omitted.) I view the balance of the analysis as *qua obiter dictum.*

HUTCHINSON, J., joins in this concurring opinion.